# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

|  |  |
|---|---|
| IN RE: | **Case No. 20-00784-NGH** |
| **REBECCA LYNN ESTRACA,** | |
| **Debtor.** | **Chapter 7** |

## MEMORANDUM OF DECISION

### INTRODUCTION

Rebecca Lynn Estraca ("Debtor") filed a chapter 7[1] bankruptcy petition on August 25, 2020.  Doc. No. 1.[2]  In doing so, Debtor was represented by attorney Kameron M. Youngblood ("Youngblood").  Upon finding a number of issues concerning how Youngblood was handling his cases, the United States Trustee ("UST") filed a motion for sanctions in this and over 50 other cases.[3]  Doc. No. 30.  The Court conducted a hearing on the motions on January 3, 2022, and allowed supplemental briefing.  The UST filed a supplemental brief, Doc. No. 53, and a motion requesting the evidentiary record be supplemented with an affidavit of chapter 7 trustee Patrick Geile, Doc. No. 52.  No

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure 1001–9037, and all "LBR" references are to this Court's Local Bankruptcy Rules.

[2] The Court took judicial notice of the record pursuant to Federal Rule of Evidence 201 at the January 3, 2022 hearing in this case.

[3] Seven of the cases were assigned to the undersigned Judge; the remaining 44 were assigned to Chief Judge Joseph M. Meier.  The UST's motion references another case assigned to the undersigned Judge, *In re Wheeler*, Case No. 20-00532-NGH, *see* Doc. No. 30 at 29, however, the motion was not filed in the *Wheeler* case, and therefore, the Court will not enter a decision or order in that case.

objections were filed before the February 15, 2022 deadline,[4] and the UST's motions for sanctions were taken under advisement in the seven cases before the undersigned Judge.

After considering the record, submissions, and arguments, as well as applicable law, this decision resolves the motion for sanctions. Fed. R. Bankr. P. 7052; 9014.

## DISCUSSION AND DISPOSITION

In the motion in this case, the UST alleges several specific areas of sanctionable conduct, arguing Youngblood:  1) violated Rule 1007; 2) filed a misleading Rule 2016(b) disclosure; 3) created a conflict of interest between himself and Debtor through his fee agreement; 4) charged Debtor unreasonable fees; and 5) violated the Court's wet-ink signature requirements.  Additionally, the UST alleges a pattern and practice of violations under § 526.  As a result, the UST seeks the following monetary and non-monetary remedies:

1. Cancelling or voiding any contract or agreement between Debtor and Youngblood under § 329;

2. Disgorging the fees Debtor paid to Youngblood under § 329;

3. Injunctive relief under § 526(c)(5) and the Court's inherent powers, specifically:
   a. Suspending Youngblood's practice in front of the Court until the Court is satisfied the concerns identified have been corrected;
   b. If Youngblood is allowed to practice in front of the Court again, requiring him to file a "status report" signed by the client and Youngblood in each case where he appears as counsel, attesting that:
      i. Youngblood personally met and reviewed the Petition, Schedules, Statement of Financial Affairs, and other documents with the client prior to filing;
      ii. The client's questions have been answered regarding the Petition, Schedules, Statement of Financial Affairs, and other documents, and the information included therein, and the client is satisfied he or she is receiving adequate representation from Youngblood; and

---

[4] Therefore, the motion to supplement will be granted.

MEMORANDUM OF DECISION - 2

       iii.  The client provided Youngblood a copy of the wet signatures for the Petition, Schedules, SOFA, and other documents filed in the case. The requirement to file such a report should continue until the Court is satisfied it is no longer necessary.

4.  Imposing a civil penalty under § 526(c)(5)(B) against Youngblood to deter him from making untrue and misleading statements and misrepresentations in the future, as a result of his intentional violations, and pattern and practice of violating, § 526(a)(1), (a)(2), and (a)(3).

Doc. Nos. 30 and 53. The Court will discuss each of the allegations and the potential sanctions.

### A.    Sanctionable Conduct

#### 1.    Rule 1007

The Court, creditors, the trustee, and UST rely on a debtor's bankruptcy documents for information about a debtor's finances as such information is typically private. The Code, Rules, and local rules contain requirements and deadlines for filing those necessary documents. Section 521 describes a debtor's duties, including what documents must be filed. Specifically, § 521(a)(1) requires a debtor to file certain schedules, a Statement of Financial Affairs ("SOFA"), and copies of payment advices. Rule 1007(b) lists the documents a debtor is required to file, and subsection (c) of that Rule provides the deadlines for doing so. Of particular relevance here, a debtor must file schedules and the SOFA within fourteen days of filing the petition. Rule 1007(c). The Rule further allows for an extension of this time "only on motion for cause shown and on notice to the [UST]…." *Id*. LBR 1007.2 further limits extensions of time for filing required documents, providing that any extension given under Rule 1007(c):

will not be granted beyond the date set for the meeting of creditors under § 341(a) unless a judge orders otherwise for cause shown. Any motion for

extension of time filed under this rule shall (a) state the date of extension requested and (b) identify the date currently set for the § 341(a) meeting or, alternatively, affirmatively allege that no such date has yet been set. An extension beyond the date set for the § 341(a) meeting will not be granted unless the debtor has also been granted a continuance of the § 341(a) meeting, pursuant to LBR 2003.1, and the confirmation hearing if applicable, and provided appropriate notice thereof.

In this case, Debtor filed a skeletal bankruptcy petition on August 25, 2020; the meeting of creditors was scheduled for October 1, 2020. Doc. Nos. 1 and 2. The deadline to file all other required documents was September 8, 2020. Doc. No. 15. On September 10, 2020, two days after the deadline but still 21 days before the meeting of creditors, Youngblood filed the required documents. Doc. Nos. 18–21. He did not request an extension of the deadline.

Both Youngblood and Debtor appeared at the October 1, 2020 meeting of creditors. Doc. No. 22. While the Court does not condone Youngblood's tardy filing of the necessary documents nor his failure to seek an extension, the Court nevertheless concludes Youngblood's performance, while marginally deficient, is not by itself a basis for sanctions. The UST alleges additional violations, however, that provide grounds for sanctions.

2.   **Rule 2016(b) Disclosure**

Section 329 of the Code requires an attorney to disclose the amount of all "compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case[.]" This disclosure requirement is implemented by Rule 2016(b), which requires:

MEMORANDUM OF DECISION - 4

Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 14 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. . . . A supplemental statement shall be filed and transmitted to the United States trustee within 14 days after any payment or agreement not previously disclosed.

In this case, Youngblood filed a disclosure of compensation contemporaneous with the petition on August 25, 2020 ("Disclosure"). Doc. No. 4. The Disclosure indicates Debtor paid Youngblood nothing prior to the bankruptcy filing, but the agreed fee was $1,910 "for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case . . .." *Id.* It further provides in paragraph 5:

In return for the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:

a.  Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;

b.  Preparation and filing of any petition, schedules, statement of affairs and plan which may be required;

c.  Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;

d.  [Left open for additional provisions; none were listed].

*Id.* The Disclosure also provided details about the financial agreement between Debtor and Youngblood in paragraph 5:

e.  Counsel has a line of credit from a third-party lender secured by the assignment to the lender of the account receivable owed by Debtor(s). The financing is not factoring and also should not be considered an agreement to share compensation. The Lender will have rights to collect payment from the Debtor(s) as well as any Guarantor. Such financing clearly provides that Debtor(s) are fully informed, must and agree to the financing and assignment.

MEMORANDUM OF DECISION - 5

Debtor(s) understand that the actual loan agreements may be available upon request by a party-in-interest.

f. Debtor and Attorney have entered into two separate fee agreements. The first was for $0.00 fees, but may have included costs, signed pre-petition, for the preparation and filing of the bankruptcy petition, review, analysis and advisement of the typical matters that are required to be performed pre-petition by a bankruptcy attorney under the applicable bankruptcy and ethical rules. Any fees and costs for pre-petition services unpaid at the time of filing are waived. The second fee agreement was for $1,910.00, signed post-petition for the completion of the balance of the schedules, representation at the 341 meeting of creditors, and the legal services outlined in the fee agreement. The post-petition agreement allows the Debtor(s) to make payments for up to 12 months post-petition. Counsel's services to the Debtor(s) are not unbundled. Instead, they are bifurcated into pre-petition services and post-petition. See [two cited cases], and related cases. Counsel is able to draw funds under its line of credit in an amount up to 75% of the post-petition fees so long as it assigns the post-petition receivable to the lender as collateral for payment, in which event in which event [sic] the lender will manage the account receivable in accordance with the terms of the line of credit agreement.

*Id.* Next, the Disclosure excludes the following services in paragraph (6):

By agreement with the debtor(s), the above-disclosed fee does not include the following services:

. . . Representation of the debtor(s) in any:

- adversary proceeding, dischargeability actions and other contested bankruptcy matters

- municipal, county, state or other local jurisdiction court matters

- tax matters

- efforts to discharge student loans

- creditor violations of the automatic stay, discharge injunction or Fair Credit Reporting Act.

*Id.*

Finally, in paragraph (7), Youngblood explains the fee options available to Debtor,

MEMORANDUM OF DECISION - 6

as follows:

> Counsel offered debtor(s) two options for the payment of counsel's fees: (1) pre-pay the fees in full prior to the Chapter 7 bankruptcy petition being filed, or (2) bifurcate the attorney services into pre- and post-petition work in order to facilitate the debtor(s) obtaining the benefit of being filed right away and making payments post-petition for post-petition work. Counsel charges a higher fee for the second option. There are a number of reasons for charging a higher fee:
>
>> a. Counsel performs additional work to split the engagement;
>>
>> b. Counsel takes on risk by allowing the debtor to pay the attorney fee over time instead of collecting the entire fee up front;
>>
>> c. The option provides the debtor(s) with the benefit of a quicker filing than if the debtor(s) had to come up with the money to pay in advance;
>>
>> d. The option gives debtor(s) an opportunity to begin rebuilding their credit score by making timely payments toward the attorney fee;
>>
>> e. Counsel will not charge the debtor additional fees for certain services that if required would otherwise cost the debtor(s) more if debtor(s) had paid the entire fee before the case was filed; and
>>
>> f. FSF (described below) charges a fee to Counsel for its financing, payment management, credit reporting and other services provided to Counsel, for which FSF charges a fee equal to [remainder of paragraph is cut off].

Doc. No. 4.

The text of Youngblood's Disclosure is plainly misleading and inconsistent. First, paragraph 5(a)–(c) provides that for the $1,910 fee, Youngblood will perform both pre- and post-petition services. Those include analyzing Debtor's financial situation, determining whether a bankruptcy petition ought to be filed, and preparing the petition, all clearly pre-petition services. But for the same fee, Youngblood also agrees to represent Debtor at the meeting of creditors, which clearly occurs post-petition.

MEMORANDUM OF DECISION - 7

In subparagraph (f), however, Youngblood inconsistently discloses that he and Debtor entered into two separate fee agreements, with the first covering pre-petition services such as the preparation and filing of the bankruptcy petition, for which any unpaid amount of those fees and costs at the time of filing were "waived by Counsel," and the second alleged fee agreement covers everything else in the case, other than those tasks excepted from the agreement. *Id.* As such, it is unclear whether Youngblood charged Debtor anything for pre-petition services—the Disclosure indicates the $1,910 fee covers both pre- and post-petition services, while a separate subparagraph suggests Youngblood did all pre-petition work for free. This inconsistency renders the Disclosure misleading.

Moreover, given the content of the Disclosure, and the representations made at the January 3 hearing, the Court ordered Youngblood to file an amended Rule 2016(b) statement to disclose all payments Youngblood received post-petition. Doc. No. 50. Youngblood failed to comply with that Order. That failure is itself sanctionable.

### 3.    **Conflicts of Interest**

Next, the UST alleges the language in the Disclosure creates a conflict of interest prohibited by the Idaho Rules of Professional Conduct. Those professional rules apply to attorneys practicing before this Court. LBR 9010.1(g) ("members of the bar of this court shall adhere to the Rules of Professional Conduct promulgated and adopted by the Supreme Court of the State of Idaho."); *In re Grimmett*, 2017 WL 2437231, at *5 (Bankr. D. Idaho Jun. 5, 2017), *aff'd* Case No. 1:17-cv-00266-EJL (D. Idaho Feb. 16, 2018).

Here, Youngblood's Disclosure provides that "Counsel has a line of credit from a

MEMORANDUM OF DECISION - 8

third-party lender secured by the assignment of the account receivable owed by

Debtor(s)," and that the lender will have the right to collect payment from the Debtor.

Doc. No. 4.  It further provides that Youngblood may "draw funds under its line of credit

in an amount up to 75% of the post-petition fees so long as it assigns the post-petition

receivable to the lender as collateral for payment, in which event the lender [] will

manage the account receivable in accordance with the terms of the line of credit

agreement." *Id.*  This arrangement enables Youngblood to draw from this line of credit

only if he assigns the receivable—the balance of the fees owed by Debtor—to the lender.

In this way, Youngblood is having Debtor pay his fees under an installment contract.

Indeed, the Disclosure actually uses the word "loan" when it provides that the "actual

loan agreements may be available upon request by a party-in-interest." *Id.*

The Court finds this problematic.  As the UST points out, this arrangement

violates the Idaho Rules of Professional Conduct.  Pertinent here, Idaho Rule of

Professional Conduct 1.7 governs conflicts of interest and provides that a lawyer shall not

represent a client if "there is a significant risk that the representation of one or more

clients will be materially limited by . . . the personal interests of the lawyer[.]"  Idaho

Rule of Professional Conduct 1.7(a).

The arrangement established in the Disclosure is essentially an installment

payment plan, and when the payments are assigned to a third-party for collection,

Youngblood then has access to a line of credit.  It is patently clear, however, that Debtor

could not afford to make payments.  Debtor's schedule J plainly shows that Debtor's

expenses exceeded her income by $141.54 each month.  Doc. No. 18 at 38–41 (schedules

MEMORANDUM OF DECISION - 9

I and J).  As such, this payment arrangement put Debtor at financial risk.  Thus, it appears
Youngblood signed Debtor up for a plan that was financially harmful to Debtor but
beneficial to Youngblood.  This creates a conflict of interest and violates Idaho Rule of
Professional Conduct 1.7(a).

4.    **Reasonableness of Bifurcated Fees**

The UST also asserts the fees in this case were unreasonable based on the conflicts
created under the fee agreement between Debtor and Youngblood and based on the fee
structure as compared to other cases.  The UST argues that because the Disclosure
provides that Youngblood is charging nothing, or in the verbiage of the Disclosure, he
"waives" the fees for pre-petition services, then his post-petition services are therefore
worth $1,910.  The UST contrasts this figure with those cases where Youngblood's fee is
not bifurcated—where the debtor pays in cash up front.  The UST's theory is that if
Youngblood's post-petition services are worth $1,910, then a cash deal should be for
more money, as the debtor is also paying Youngblood for his pre-petition work.  To
prove this point, the UST considered all of Youngblood's open chapter 7 cases where the
payment was made in cash and averaged the total fee charged.  The UST then did the
same with the bifurcated cases, but first subtracted the 25% fee the company providing
the line of credit charges Youngblood for this service, and then averaged the remaining
fee amounts.  The UST found that the cash payment fee was only $18.71 more than that
charged in the bifurcated cases.  From this the UST concluded that either Youngblood's
pre-petition work was only worth $18.71 on average, which is implausible, or that the
bifurcated fees were unreasonable.

The Court cannot reach the same conclusion on the evidence presented.  Whether fees charged are reasonable is case specific and cannot be based on the law of averages.  Each case is different, and what is a reasonable fee to charge one debtor may not be so for the next.  Accordingly, the UST's motion for sanctions due to the unreasonableness of the fee charged will be denied.

### 5.   "Wet-Ink" Signature Violations

Pursuant to LBR 5003.1, all documents filed in a bankruptcy case must be filed electronically.  LBR 5003.1(c).  Original documents must be retained by the filing party "for a period of not less than the maximum allowed time to complete any appellate process, or the time the case of which the document is a part, is closed, whichever is later."  LBR 5003.1(e).  LBR 5003.1(e) also requires the filing party to produce the original document "upon an order of the court."  LBR 5003.1(j) addresses signatures and establishes that "[t]he electronic filing of any document by a Registered Participant shall constitute the signature of that person for all purposes provided in the Federal Rules of Bankruptcy Procedure.  For instructions regarding electronic signatures, refer to the ECF Procedures."  In turn, the "ECF Procedures" referred to are located on this Court's website.  *See* LBR 5003.1(b).  Paragraph 13A of the ECF Procedures document provides:

> A Registered Participant filing a Verified Pleading [a pleading in which a person verifies, certifies, affirms or swears under oath or penalty of perjury concerning the truth of matters set forth in that pleading or document] electronically shall insure the electronic version conforms to the original, signed pleading/document.  Each signature on the original, signed pleading/document shall be indicated on the electronically filed Verified Pleading with the typed name on the signature line of the person purported to have signed the pleading/document.  ***The electronic filing of a Verified Pleading constitutes a representation by the Registered Participant that he or she has the original, signed document in his or her possession at the***

MEMORANDUM OF DECISION - 11

> *time of filing*.  The Registered Participant shall retain the Verified Pleading
> for a period of not less than the maximum allowed time to complete any
> appellate process, or the time the case or Adversary Proceeding of which the
> document is a part, is closed, whichever is later. The document shall be
> produced upon an order of the Court.

(emphasis added).  The ECF Procedures instruct attorneys to file a scanned pdf copy of

the original signature page of the original and any amended petition, schedules, and

statement of financial affairs at the same time as the electronic version is filed.  ECF

Procedures, at ¶ 13B.  Finally, the ECF Procedures provide that the "original of all

conventionally signed documents shall be retained pursuant to Dist. Idaho Loc. Civ. R.

5.1(e) or LBR 5003.1(e)."  *Id.* at ¶ 19.

In this case, the UST asserts the signature pages filed by Youngblood do not

satisfy the requirements of the local rule and the Court's ECF Procedures.  *See* Doc. No.

19 (declaration of individual schedules, statement of financial affairs, and statement of

intention) and Doc. No. 20 (statement of current monthly income).  Specifically, the UST

contends the signature pages "appear to be photographs of signature pages that were

either mailed, texted, or otherwise provided to Youngblood" and therefore "it does not

appear Youngblood physically obtained, and is retaining, the original wet ink

signatures[.]"  Doc. No. 30 at 13.  While the Court agrees the pages at issue appear to be

photographs or copies of signature pages, the Court cannot join the UST's leap of logic

and conclude Youngblood has never obtained and does not now retain the original wet

ink signatures.  There are other plausible explanations for why poor-quality copies of wet

signature pages might be filed with the Court.  The Court will not presume Youngblood

engaged in sanctionable conduct when the evidence is lacking.

6.    **"Pattern and Practice" of Violations Under § 526**

The UST also argues it has demonstrated a pattern and practice of Youngblood

violating § 526.  Section 526 of the Code provides restrictions on "debt relief agencies."

It provides, in pertinent part:

(a) A debt relief agency shall not—

(1) fail to perform any service that such agency informed an assisted person or prospective assisted person it would provide in connection with  a case or proceeding under this title;

(2) make any statement, or counsel or advise any assisted person or prospective assisted person to make a statement in a document filed  in     a case or proceeding under this title, that is untrue or misleading, or that upon the exercise of reasonable care, should have been known by such agency to be untrue or misleading;

(3) misrepresent to any assisted person or prospective assisted person, directly or indirectly, affirmatively or by material omission, with respect to—

(A) the services that such agency will provide to such person; or

(B) the benefits and risks that may result if such person becomes a debtor in a case under this title;

. . .

(c)      . . .

(5) Notwithstanding any other provision of Federal law and in addition to any other remedy provided under Federal or State law, if the court, on its own motion or on the motion of the United States trustee or the debtor, finds that a person intentionally violated this section, or engaged in a clear and consistent pattern or practice of violating this section, the court may—

(A) enjoin the violation of such section; or

(B) impose an appropriate civil penalty against such person.

MEMORANDUM OF DECISION - 13

A bankruptcy attorney is a debt relief agency.  *See* § 101(12A) (defining "debt relief agency" as "any person who provides any bankruptcy assistance to an assisted person in return for the payment of money or other valuable consideration"); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 232 (2010) (holding that a bankruptcy attorney falls within the definition of a "debt relief agency.").  The Code also defines "assisted person" as "any person whose debts consist primarily of consumer debts and the value of whose nonexempt property is less than $204,425."[5]  Section 101(3).  Thus, Youngblood qualifies as a debt relief agency as Debtor claimed primarily consumer debts and nonexempt property valued at less than $204,425.

As the statute indicates, if a debt relief agency represents to an assisted person that it will provide certain services in connection with a bankruptcy case, and then fails to perform those services, the debt relief agency has violated § 526(a)(1).  Moreover, § 526(a)(2) is violated if a debt relief agency makes, or counsels or advises any assisted person to make, a statement in a document that is filed with the court, that is untrue or misleading, or using reasonable care should have been known to be untrue or misleading.  Finally, if a debt relief agency misrepresents the services that it will provide to an assisted person or the benefits and risks that may result if such person files a bankruptcy petition, then § 526(a)(3) may have been violated.

The Court finds a clear and consistent pattern and practice of Youngblood violating § 526 has been demonstrated.  Of the seven cases assigned to the undersigned

---

[5] This figure is subject to adjustment and was adjusted to $204,425 effective April 1, 2019.  The amount increased to $226,850 on April 1, 2022.  The case at issue here was filed when the amount was $204,425.

Judge in which the UST filed the sanctions motion, this Court has determined the following:

|  |  |
|---|---|
| Violation of Rule 1007 and § 521: | 2 cases |
| 2016(b) disclosure problems: | 7 cases |
| Conflict of interest in fee agreement: | 6 cases |

Add those to the findings in the May 2022 decisions on the 44 cases before the Honorable Joseph M. Meier (20 Rule 1007 violation cases; 31 Rule 2016(b) disclosure problem cases; and 23 conflict cases), and the Court concludes the UST has established a clear pattern and practice of Youngblood violating § 526. *See In re Hanawahine*, 577 B.R. 573, 580 (Bankr. D. Haw. 2017) (a pattern and practice was established by the fact that bankruptcy courts in three other jurisdictions had sanctioned the bankruptcy firm and/or its principal for abandoning debtors, and a motion was pending in a fourth jurisdiction). Such practices expose Youngblood to both injunctive and civil penalties.

### B.   Sanctions and Penalties

As outlined above, Youngblood engaged in multiple forms of sanctionable conduct. In response, the UST seeks cancelation of the contract between Youngblood and Debtor, disgorgement of Youngblood's $1,910 fee, injunctive relief, and imposition of a civil penalty.

#### 1.   Section 329 and Disgorgement of Fees

The UST seeks to void or cancel the contract of employment between Youngblood and Debtor pursuant to § 329. However, based on Youngblood's representations in other cases that he was no longer able to represent clients, his failure to appear at the January 3

MEMORANDUM OF DECISION - 15

hearing on the UST's sanctions motion, and his failure to file an amended Rule 2016(b)

disclosure statement, the Court removed Youngblood as counsel of record and terminated

the attorney client relationship between Youngblood and Debtor on February 3, 2022.

Doc. No. 57.  Thus, the UST's request is moot as the relief has already been granted.

As the Court has already cancelled the contract between Youngblood and Debtor,

it now turns to the issue of disgorgement.  Section 329(b) provides that if the

compensation paid to a debtor's counsel exceeds the reasonable value for the services

provided, "the court may cancel any such agreement, or order the return of any such

payment, to the extent excessive. . ..."  Courts interpreting this provision have looked

beyond the quantity of fees charged and used it to redress other issues with the attorney

client relationship.  *See e.g., Grimmett*, 2017 WL 2437231 at *9 (fees deemed excessive

because fee agreement and collection measures created conflict of interest); *Hale v.

United States Tr, (In re Basham),* 208 B.R. 926, 932 (9th Cir. BAP 1997) (the record

"supports the bankruptcy court's finding that the fees were unreasonable given the …

failure to provide competent and complete representation of the [debtors]); *In re Martin*,

197 B.R. 120, 126 (Bankr. D. Colo. 1996) ("The compensation to be paid to an attorney

can be deemed excessive for a host of reasons, including but not limited to an attorney's

failure to perform agreed upon services, failure to comply with the disclosure

requirements, the existence of conflicts of interest, and the like.").

The Bankruptcy Code's disclosure requirements are mandatory, and courts have

held that an attorney who fails to comply with those requirements forfeits any right to

receive compensation.  *Hale*, 208 B.R. at 930–31 (citing *Peugeot v. United States Tr. (In*

MEMORANDUM OF DECISION - 16

*re Crayton),* 192 B.R. 970, 981 (9th Cir. BAP 1996)).  Once the bankruptcy court

determines that an attorney has violated § 329 and Rule 2016, the bankruptcy court has

the authority to order the attorney to disgorge all of the attorney's fees.  *Hale,* 208 B.R. at

931; *In re Blackburn*, 448 B.R. 28, 43 (Bankr. D. Idaho 2011) ("The state of the law is

clear—an attorney who neglects to meet the disclosure requirements of § 329(a) and Rule

2016(b), even if inadvertently, forfeits the right to receive compensation for services

rendered and may be ordered to return fees already received.").  Indeed, the Tenth Circuit

held that "full disgorgement is [not] always appropriate for failure to disclose under

§ 329[,] [b]ut it should be the default sanction, and there must be sound reasons for

anything less."  *SE Prop. Holdings, LLC v. Steward (In re Stewart)*, 970 F.3d 1255, 1267

(10th Cir. 2020).  The Ninth Circuit concluded that even a negligent or inadvertent failure

to fully disclose relevant information under Rule 2016 may result in denial of requested

fees.  *Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park–Helena Corp.),* 63 F.3d

877, 882 (9th Cir. 1995).  Finally, the caselaw is clear that filing an inaccurate disclosure

statement "is appropriate basis for the total disallowance of compensation by counsel."

*Grimmett*, 2017 WL 2437231 at *10; *see also Hale,* 208 B.R. at 931; *Law Offices of*

*Nicholas A. Franke v. Tiffany (In re Lewis)*, 113 F.3d 1040, 1045–46 (9th Cir. 1997);

*Park–Helena Corp.*, 63 F.3d at 881–82.  Here, Youngblood's Disclosure was internally

inconsistent and unclear, and thus provides grounds for disgorgement of the entire fee

charged by him in this case.

　　　While the case law is clear that disgorgement of the entire fee could be

appropriate, the Court will give credit where credit is due.  In this case, the petition and

MEMORANDUM OF DECISION - 17

schedules were successfully filed, Youngblood appeared at the § 341(a) meeting of creditors and represented Debtor, and on December 10, 2020, Debtor received a discharge. Doc. No. 28. To reach this point, certain expenses were necessarily incurred, including payment of the filing fee of $335. While it is unclear whether the funds to pay this expense were separately provided by Debtor or were paid from funds described in the Disclosure, the Court's docket reflects Youngblood electronically paid the filing fee, as there is no notation of a check number, leading the Court to conclude the filing fee was paid from the funds Debtor agreed to pay Youngblood according to the Disclosure. Doc. No. 8. Because the Court is respectful of the fact that there are costs associated with the filing of a bankruptcy petition, the Court will allot $400 to cover these expenses and some work performed. Accordingly, the Court will order that Youngblood disgorge the entirety of the fee charged in this case, minus $400, for a total disgorgement of $1,510.

## 2.    The Court's Inherent Powers and § 526(c)

The Supreme Court stated that an Article III federal court has the inherent power "to control admission to this bar and to discipline attorneys who appear before it." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991). The Ninth Circuit recognized that bankruptcy courts also "have the inherent power to sanction that *Chambers* recognized exists within Article III courts." *Caldwell v. Unified Cap. Corp.* (*In re Rainbow Mag., Inc.*), 77 F.3d 278, 284 (9th Cir. 1996); *see also In re Aleman,* 2015 WL 1956271, at *1–2 (Bankr. D. Idaho Apr. 29, 2015); *In re Hurd,* 2010 WL 3190752, at *2 (Bankr. D. Idaho Aug. 11, 2010) ("A bankruptcy court has the authority to regulate the practice of lawyers who appear before it. Such authority stems from the court's inherent powers, the

MEMORANDUM OF DECISION - 18

Code and the Rules."); *Gardner v. Law Office of Lyndon B. Steimel (In re Valentine),* 2014 WL 1347229, at * 3 (Bankr. D. Idaho Apr. 3, 2014) ("The BAP recognized that, under Ninth Circuit precedent, the bankruptcy courts have the power to sanction under their civil contempt authority under § 105(a) and under their inherent sanction authority." (internal quotations omitted)).

These inherent powers are not without limits, however. "Because of their potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44. Thus, like the bankruptcy court's civil contempt authority, inherent sanction authority "does not authorize significant punitive damages." *Knupfer v. Lindblade (In re Dyer),* 322 F.3d 1178, 1197 (9th Cir. 2003) (noting that the Ninth Circuit has "refrained from authorizing a punitive damage award under the bankruptcy court's inherent sanction authority"). "Civil penalties must either be compensatory or designed to coerce compliance." *Dyer,* 322 F.2d at 1192 (citing *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.,* 244 F.3d 1128, 1137–38 (9th Cir. 2001)).

When there is bad faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the Court ordinarily should rely on the Rules rather than its inherent power. But if in the informed discretion of the Court, neither the statute nor the Rules are up to the task, the Court may safely rely on its inherent power. *Chambers*, 501 U.S. at 50. As to statutory authority, if a clear and consistent pattern or practice of violating § 526 is found as is the case here, § 526(c) permits the Court to enjoin the violation and impose a civil penalty against the attorney. The UST asks for both an injunction and the imposition of a civil penalty under the Court's inherent powers and

MEMORANDUM OF DECISION - 19

§ 526.

### a.    Injunctive Relief

While the UST seeks injunctive relief against Youngblood and such relief has been proven to be appropriate, it has already been granted.  First, the UST requests Youngblood be suspended from practice before this Court until the issues raised in the pending motion have been corrected.  This request is moot, as Youngblood has been suspended under this Court's reciprocal discipline protocols and currently has no filing privileges.[6]

Second, the UST seeks to impose certain conditions on Youngblood's ability to file in this Court should Youngblood return to the practice of law.  However, an injunction containing those conditions was issued by Chief Judge Meier in May 2022, when he ruled on the 44 cases pending before him on identical sanctions motions.  Chief Judge Meier entered orders requiring that if Youngblood returns to the practice of law, he is required to:

> a. . . . obtain, file, and retain each debtor's wet signatures in accordance with the requirements of the Code, Rules, Local Rules and the Court's ECF Procedures;
>
> b. . . . file a statement bearing a wet signature from the client, attesting that Youngblood has met with the client and reviewed all important documents prior to filing; and
>
> c. [file a statement] that the client has had a reasonable opportunity to converse with Youngblood and to ask questions, and that Youngblood has responded to those questions.

---

[6] Youngblood failed to pay his annual bar dues, and on March 14, 2022, the Idaho Bar Association suspended him from the practice of law.  As a result, this Court issued a reciprocal notice of suspension and turned off Youngblood's electronic filing privileges.

*See e.g., In re Andreasen*, Case No. 19-40324-JMM at Doc. No. 54. The only condition Chief Judge Meier declined to impose was the UST's request that Youngblood's future clients include an assertion in their statement that they were "satisfied" with Youngblood's representation. To the extent the UST seeks an injunction specifically requesting that assertion be included, the Court agrees with Chief Judge Meier and does not find it appropriate. The Court will not require every client be "satisfied" with Youngblood's work. Thus, the Court will not order further injunctive relief to that already imposed by Chief Judge Meier.

### b.    Civil Penalty

Finally, the UST asks the Court to impose a civil penalty pursuant to § 526(c)(5)(B)[7] to deter Youngblood from making untrue and misleading statements and representations in the future. While § 526(c)(5)(B) permits the imposition of a civil penalty where a pattern and practice of violations has occurred, the Court declines the UST's invitation here.

A civil penalty must be appropriate in amount and intended to deter violative conduct in the future. *In re Hanawahine*, 577 B.R. at 580 (citing *In re Huffman*, 505 B.R. 726, 766 (Bankr. S.D. Miss. 2014)); *In re Dellutri L. Grp.*, 482 B.R. 642, 653–54 (Bankr. M.D. Fla. 2012) (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) (a civil sanction is "remedial in nature and intended to enforce compliance.")). While the

---

[7] This statute provides, "if the court, on its own motion or on the motion of the United States trustee or the debtor, finds that a person intentionally violated this section, or engaged in a clear and consistent pattern or practice of violating this section, the court may . . . (B) impose an appropriate civil penalty against such person."

UST has established a clear and consistent pattern of violations on Youngblood's part,

the Court finds a civil penalty unnecessary as a deterrent.  The Court will order

disgorgement of the fees charged in this case, and an injunction exists that will require

significant record keeping and reporting requirements in future cases should Youngblood

return to the practice of law.  These measures are designed to curtail Youngblood's

cavalier approach to the practice of law and ensure that any future practice conforms to

applicable statutes, rules, and ethical responsibilities.  As such, an additional deterrent in

the form of a civil penalty is unwarranted here.

**CONCLUSION**

Finding merit in many of the allegations raised in the UST's motion for sanctions,

the Court will order disgorgement of $1,510 in fees Youngblood charged Debtor for his

services.  The Court will not impose any additional injunction to that which is already in

place or civil penalty.

DATED:  August 3, 2022



_____
NOAH G. HILLEN
U.S. Bankruptcy Judge

MEMORANDUM OF DECISION - 22